## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| GARFIELD REDDICK, on behalf of himself individually and all other similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>HEWLETT-PACKARD COMPANY; HP ENTERPRISE SERVICES, LLC; HEWLETT-PACKARD ENTERPRISE CO.; HP, Inc.; and DXC TECHNOLOGY SERVICES, LLC,<br><br>    Defendants. | Civil Action No.: |

## COMPLAINT

Plaintiff Garfield Reddick ("Mr. Reddick" or "Plaintiff"), by and though counsel, Hogue & Belong and in support of his causes of action against Defendants, states and alleges as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff Reddick files this Complaint against Defendants Hewlett-Packard Company ("HP Co."), Hewlett-Packard Enterprise Co. ("HPE"), HP Enterprise Services, LLC ("HPS"), HP, Inc. ("HPI"), and DXC Technology Services, LLC ("DXC") (collectively "HP" or "Defendants") individually and on behalf of all those similarly situated employees ("Plaintiffs" or the "Class") as a result of Defendants' discrimination against them on the basis of age.  Defendants adversely

altered the terms and conditions of Plaintiffs' employment, denied Plaintiffs the opportunities that other employees outside their protected class received, and terminated their employment, in violation of state and federal law.

2.      Plaintiff brings claims against Defendants pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA").

## PARTIES

3.      Plaintiff Reddick is and, at all times relevant to the Complaint, was a resident of Georgia.  At all relevant times, Reddick was a member of the protected class of individuals recognized under the ADEA.  Plaintiff Reddick was 57 years old at the time he was terminated by HP.

4.      At all material times, HP conducted business within the United States.  One of HP's headquarters and principal place of business is located in Alpharetta, Georgia.  Alpharetta, Georgia is one of the locations where HP directs, controls, and coordinates its business operations.

5.      HP has gone through significant corporate restructuring.  Below is an organizational chart of that restructuring:



6.     The above-referenced entities are one interrelated enterprise. Despite the fact that they are different entities, those differences are in name only. All the aforementioned entities share a unity of interest and all are co-conspirators for the acts described below.

7.     The above-referenced Defendants are also the joint employers of each other. Those entities share common control, management, resources, and employment policies.

8.     The Defendants – even though technically "separate" entities – all utilize the exact same Workforce Reduction Plan ("WFR").

9.     The WFR is the centerpiece of Defendants' discriminatory practices.

10.    The implementation of the WFR first began with HP Co. in 2012.  Then, in 2015, HP Co. started splintering off into different affiliated entities. Notwithstanding splitting off from HP Co, except for the title, the terms of the WFR remained the same among the various affiliated HP entities.

11.    Based on information and belief, Defendants have one concerted effort to maintain consistency regarding the WFR; as such, they have a team of high-ranking individuals coordinate the WFR to assure it remains uniform.

12.    When one of Defendants' employees brings an age discrimination claim premised on the WFR, and then settles that claim, he is made to settle with all of Defendants' entities.   Accordingly, Defendants' act as one single integrated enterprise and the alter egos of one another.

13.    In 2015, Hewlett-Packard Company "theoretically" split in two companies – HPE and HPI.   This split, however, was in name only.   After the split, every shareholder who owned a share of Hewlett-Packard Company was assigned one share of HPE and one share of HPI.  These shareholders retain ultimate control of all significant decisions and equal financial control.

14.    HPI and HPE's corporate headquarters[1] and nerve centers are located in Palo Alto, California where they manage, direct, coordinate and control their business operations.

15.    Moreover, the chief executive officers of both HPE and HPI both worked for Hewlett-Packard Company at the time of the split and they closely communicated with one another about employees and business operations, including future plans regarding the WFR.

16.    All the aforementioned entities are interrelated and integrated such that each and every entity had the right to control each others' employees.  Further, the policies and practices that governed the rights of the employees were all the same.  In other words, all of the entities act in unison and operate, in reality, as a single entity.

17.    HPE and HPI knew about each other's discriminatory practices described below, and ratified those practices.  Both entities promoted, perpetuated, and they helped facilitate one another's age discrimination.  Specifically, they both knew that they favored younger employees over and to the detriment of older employees, and they both utilized the WFR to enforce their policy of disproportionately terminating and not rehiring age-protected workers.

---

[1] In approximately March 2019, HPE moved its corporate headquarters from Palo Alto, California to San Jose, California.

## JURISDICTION AND VENUE

18.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(3), and (4), 1367, 2201 and 2202, 42 U.S.C. 2000d-2 and 2000e5(f), and 29 U.S.C. § 621, et seq.

19.    This is a suit authorized and instituted pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq.

20.    Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b) because a substantial part of the employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE PREREQUISITES

21.    On or before August 31, 2020, Mr. Reddick filed a dual charge against HP with both the U.S. Equal Employment Opportunity Commission ("EEOC") concerning HP's policy and practice that targeted himself and other employees aged 40 years and older through a pattern and practice of unlawful terminations. The EEOC issued Mr. Reddick a letter confirming his right-to-sue under federal laws on September 17, 2020 (the "Right to Sue").  Attached as Exhibit "A" is a true and correct copy of the Right to Sue.

///

///

///

## FACTUAL ALLEGATIONS

**Garfield Reddick Was a Talented and Experienced Employee That Loyally Served HP for over 3 years, Until Being Discriminated Against Because of His Age.**

22.    Mr. Reddick was born on January 9, 1963, and is currently 57 years old.

23.    Mr. Reddick was first hired by HP as an independent contractor in July 2017.  Subsequently, in February 2018, HP promoted Mr. Reddick to a full-time employee. At the time of his termination, Mr. Reddick held the position of Technical Solutions Consultant III. Mr. Reddick worked out of HP's Alpharetta, Georgia location.  Throughout his employment with HP, Mr. Reddick performed his duties in a satisfactory and competent manner. He consistently received positive performance reviews, salary increases, and bonuses.

24.    Shortly after he was an employee of HP, the company began to discriminate against Mr. Reddick because of his age. Specifically, HP denied him career advancement opportunities that were granted to younger less experienced and qualified employees. On multiple occasions, Mr. Reddick requested that HP provided him with trainings on HP's technologies, including, Virtual Connect, OneView, and GreenLake. HP repeatedly denied Mr. Reddick the opportunity to participate in these trainings that would have afforded him better job opportunities at HP.  On information and belief, younger employees were provided with these trainings.

7

25.    HP repeatedly discriminated against Mr. Reddick by denying him promotions in favor of younger employees with less experience and inferior qualifications.  Mr. Reddick repeatedly informed his manager Chiquita Valdez that he was interested in becoming a team lead.  On at least one occasion, Mr. Reddick formally requested to be team lead during a meeting with Valdez because he was performing team lead tasks and duties.  Additionally, HP employees would contact Mr. Reddick with questions they had about their projects which a team lead would normally answer.

26.    Despite Mr. Reddick's experience and willingness to take over team lead duties, HP refused to promote him to the team lead position. On information and belief, HP repeatedly promoted younger employees to the team lead position.  For instance, almost immediately after hiring a much younger employee by the name of Daniel Foreman in February 2018, HP promoted Foreman to team lead. Though Mr. Reddick did not know Foreman's birthdate, he appeared to be in his early twenties and had just graduated from college.  In comparison, at the time, Mr. Reddick had over 20 years of experience as an engineer and had worked for major technology companies.  Yet, HP promoted the much younger Mr. Foreman, despite Mr. Reddick's vast experience and superior qualifications.

27.    Furthermore, on or about December 12, 2019, Mr. Reddick applied for the position of Solution Center Technical Consultant in HP's GreenLake technologies

8

– a position where he was eminently qualified.  HP refused to hire him for the position for no other discernable reason but for his age.

28.    HP's discriminatory treatment to its older employees became a companywide unwritten policy.  Comments directed to age protected workers such as, "when are you planning on retiring," "You must be getting ready to retire," and others were commonplace throughout HP.   The unwritten policy was so consistently applied that it was understood at HP that if there was another wave of workforce reductions HP would target the age protected employees first.

29.    In fact, between the July 1, 2012 and February 21, 2017, there were 29 age discrimination complaints against HP just in California.

30.    Sometime in 2012, HP began deploying its WFR – which was a scheme to terminate older employees in favor of younger ones.   On or about February 1, 2016, HP updated its WFR and continued deploying it to terminate its older, higher paid employees and replace them with younger, lower paid employees.

31.    HP's WFR involuntarily terminates employees on a rolling basis.  Although the WFR purports to lay off employees on a neutral basis, it actually is a companywide practice that disproportionately targets employees who are 40 years of age or older – a protected class – for termination.  HP stated that its purpose in instituting the WFR was to realign its "organization to further stabilize the business and create more financial capacity to invest in innovation, but it's not enough. If

[HP is] to position [itself] as the industry leader for the future, then [HP] must take additional actions that, while tough, are necessary to move [its] business forward. These actions include a reduction in [HP's] global workforce."

32.     In May 2020, HP was still constantly eliminating the jobs of older, age-protected employees pursuant to its WFR, like Mr. Reddick, and actively replacing them with younger employees.  On or about May 14, 2020, Mr. Reddick was notified by his manager that his employment was being terminated pursuant to the 2016 WFR, and that his termination date would be May 22, 2020.  He was furnished a "Notification of Severance Materials," pursuant to which Mr. Reddick was informed that he would have two weeks as part of his "redeployment period" to find another job with HP.  If he was able to successfully find another position during that time, then he would be allowed to continue to work without interruption.  If he was not able to find another position at HP within the redeployment period, then he would be terminated and the 60-day "Preferential Rehire Period" would commence.

33.     During the WFR's 60-day "Preferential Rehire Period," Mr. Reddick would be allowed to apply for jobs within HP, and if he was selected then he would be re-hired without having to undertake the approval process normally required for a rehire.  During this period, Mr. Reddick applied for nine jobs for which he was imminently qualified. For instance, on May 13, 2020, Mr. Reddick applied for the

position of Management Services Tier 2 in the division of Greenlake.  HP refused to hire Mr. Reddick.

34.    Mr. Reddick applied for approximately eight other jobs with HP for which he was well qualified, but he was not hired because of his age. When HP terminated Mr. Reddick, HP declined to terminate many of his colleagues and instead transferred some of Mr. Reddick's team members to a different shift. Based on information and belief, the majority of employees transferred to a different shift in lieu of termination were under the age of 40 years old.

35.    At the time of Mr. Reddick's termination, HP terminated approximately 25 employees within a single "decisional unit" identified by HP pursuant to the WFR. Approximately eighteen of these terminated employees (over 72%) in this same decisional unit were over the age of 40 years of age.  As a result of HP's discrimination against Mr. Reddick because of his age, Mr. Reddick has incurred significant amounts of lost wages and benefits, and he has suffered and continues to suffer mental and emotional distress and anguish from the fact and manner of his involuntary termination and ensuing unemployment resulting therefrom.

36.    Throughout his employment with HP, Mr. Reddick performed his duties in a satisfactory and competent manner.  But for the fact that he was 40 years of age or older ("Age Protected Class"), Mr. Reddick would still be gainfully employed with HP.  In other words, because he was in the Age Protected Class he was targeted

11

and ultimately terminated pursuant to the WFR, and so too were HP's other employees in the Age Protected Class.

**HP's Employees Were Older, More Experienced, and Therefore More Expensive than the Employees at HP's Competitors.**

37.    In 2012, the median age of HP's workforce was 39 years old, the oldest in the tech industry.  With one-half of its workforce over the age of 39, HP's labor costs were higher than other tech companies.  HP employees with 10-19 years of experience are paid an average of just over $97,000 annually while employees with 20 or more years of experience are paid an average of just over $110,000 annually. By contrast, HP employees with less than 1 year of experience are paid an average of just over $64,000 while employees with 1-4 years of experience are paid an average of just over $65,000.

**HP's Workforce Reduction Plan Sought to Replace Older, Experienced Employees with Younger, Cheaper Ones.**

38.    As referenced above, HP terminates its employees in a so-called structured lay-off that HP calls Workforce Reduction Plan.

39.    HP has stated that its purpose in instituting the Workforce Reduction Plan was to realign its "organization to further stabilize the business and create more financial capacity to invest in innovation, but it's not enough.  If [HP is] to position [itself] as the industry leader for the future, then [HP] must take additional actions

that, while tough, are necessary to move [its] business forward.  These actions include a reduction in [HP's] global workforce."

40.    HP Co. utilized its Workforce Reduction Plan since 2012, and some version of that plan continues to this day.  While the Workforce Reduction Plan was revised in 2016 and 2019, the different versions of the Workforce Reduction Plan are not materially different.  HP utilized the same Workforce Reduction Plan for both HPE and HP, Inc. to eliminate employees in the Age Protected Class.

41.    HPE and HP, Inc. worked together to coordinate efforts to implement the Workforce Reduction Plan.

42.    On October 9, 2013, in anticipation of continuing deployment of its Workforce Reduction Plan, HP's then-CEO Meg Whitman described HP's staffing objectives at the company's "Hewlett-Packard Securities Analyst Meeting".  **Whitman explained that HP was aggressively seeking to replace older employees with younger employees**.  On this topic, some of Whitman's comments include, but are not limited to:

> •    ". . . a question that is actually completely relevant for all large-cap IT companies, which is how do you keep up with this next generation of IT and how do you bring people into this company for whom it isn't something they have to learn, it is what they know."

> •    ". . . we need to return to a labor pyramid that really looks like a triangle where you have a lot of early career people who bring a lot of knowledge who you're training to move up through your organization, and then people fall out either from a performance perspective or whatever."

- "And over the years, our labor pyramid . . . [has] become a bit more of a diamond.  And we are working very hard to recalibrate and reshape our labor pyramid so that it looks like the more classical pyramid that you should have in any company and particularly in ES. If you don't have a whole host of young people who are learning how to do delivery or learning how to do these kinds of things, you will be in real challenges."

- "So, this has a couple of things.  One is we get the new style of IT strength and skills.  It also helps us from a cost perspective . . . if your labor pyramid isn't the right shape, you're carrying a lot of extra cost.  The truth is we're still carrying a fair amount of extra costs across this company because the overall labor pyramid doesn't look the way it should."

- "Now, that's not something that changes like that.  Changing the shape of your labor pyramid takes a couple of years, but we are on it, and we're amping up our early career hiring, our college hiring. And we put in place an informal rule to some extent which is, listen, when you are replacing someone, really think about the new style of IT skills."

- "That should be it.  I mean, that will allow us to right size our enterprise services business to get the right onshore/offshore mix, to make sure that we have a labor pyramid with **lots of young people** coming in right out of college and graduate school and early in their careers. That's an important part of the future of the company . . . This will take another couple of years and then we should be done."[2]

43.    HP's CFO Cathie Lesjak ("Lesjak") explained the scheme as a way to proactively shift the makeup of HP's workforce towards low-level recent graduates:

---

[2] Judge Freeman characterized Ms. Whitman's comments as "startling." *See Enoh v. Hewlett Packard Enter. Co.* (N.D.Cal. July 11, 2018, No. 17-cv-04212-BLF) 2018 U.S.Dist.LEXIS 115688, at *32.

> "And the way I think about the restructuring charge . . ., it's basically catching up.  It's actually dealing with the sins of the past in which we have not been maniacally focused on getting the attrition out and then just agreeing to replace anyway and not thinking through it carefully and thinking through what types of folks we hire as replacements . . . We hire at a higher level than what we really need to do.  And the smarter thing to do would be to prime the pipeline, bring in **fresh new grads**, and kind of promote from within **as opposed to hiring a really experienced person** that is going to be much more expensive."

44.     HP's Manager of Employee Relations for the Americas, Sheri Bowman, explained that it was critical for some HP organizations to reduce expenses, and one way they had done so was by changing the composition of their workforce:

> The focus within the different organizations has evolved a lot over the past four or five years because of the turnaround that we have been trying to achieve within the organization.   And so there is a tremendous focus on increasing revenue, increasing client satisfaction to help increase revenue and reducing, you know, overall expenses.  *So that has just resulted in some organizations* **modifying their workforce** *to try to get to the right labor pyramid to achieve their business goals.*

45.     Echoing the policy espoused by Ms. Whitman, one Senior Vice President, Chief Information Officer stated about the WFR "we're getting rid of the old engineers and bringing in young engineers in their place."

46.     Consistent with HP's policy of eliminating the older members of its workforce in favor of younger cheaper workers, the employee selected to be terminated pursuant to the WFR is initially recommended by the managerial employees.   That manager or managers then notifies HP's human resource department of their selection.   The selection is then evaluated by the human

resources generalist to assure the selection is the "right fit" for termination, meaning if the selection conforms with Meg Whitman's directive to terminate older employees while retaining the younger employees. Notably, the selection is not based on merit or performance. Rather, if the selected employee is old enough, then the human resource department approves the selection and notifies the Workforce Management Team to prepare the proper paperwork to be delivered to the selected employee by his or her manager(s). Conversely, if the selection is too young, then the manager or managers are asked to select another employee.

47. Further, internal HP documentation heavily favors employees from the younger "millennial" generation to other older generations. To HP, employees from the millennial generation were highly desirable; as such, HP placed an emphasis on retaining and attracting as many "millennial" generation employees while terminating or retiring employees from the older generations.

48. On or about February 1, 2016, HP continued deploying its WFR, which continued the scheme specifically targeted to terminate its older and replace them with younger, lower paid employees. HP's Workforce Reduction Plan involuntarily terminates employees on a rolling basis. Although the WFR Plan purports to lay off employees on a neutral basis, it actually is a companywide mechanism by which HP carries out its above-described policy of

disproportionately and discriminatorily targeting employees in the Age Protected Class for termination.

49.    HP maintains meticulous records about each employee, including his or her date of birth and age.  Pursuant to HP's policy, those high-level HP employees responsible for carrying out the implementation of the WFR used this age data in order to act with the specific intent to terminate those employees of the Age Protected Class, not for any work-related reason.

50.    As an example, as of 2015, out of all of the employees HP terminated pursuant to the WFR in a single State, 85% of those terminated were age protected employees (i.e., age 40 or older).

51.    Further, pursuant to the Older Workers Benefit Protection Act ("OWBPA") in a group layoff (which the Workforce Reduction Plan was), HP was required to advise those affected employees of who in their "Decisional Unit" was also laid off and who was kept, identified by title and age.  29 C.F.R. § 1625.22 defines "Decisional Unit" as "that portion of the employer's organizational structure from which the employer chose the persons who would be offered consideration for the signing of a waiver and those who would not be offered consideration for the signing of a waiver.  The term 'decisional unit' has been developed to reflect the process by which an employer chose certain employees for a program and ruled out others from that program."

52.    The attachments identifying the "decisional unit" that HP provides to those employees it selects for the WFR are grossly inadequate, deceptively small, and intended to mislead the Age Protected Class in violation of the OWBPA.   For instance, the WFR is a structured layoff and it applies to all of HP, regardless of its hundreds of different divisions and departments.    When HP began its implementation of the WFR in 2012, it had 350,000 employees.   Since that time, HP has splintered off into several different joint companies', yet still employing the exact same WFR as one another.

53.    Despite the WFR applying to all of HP's employees (and by extension all of the nation and the state of Georgia), it only provides the above-referenced necessary disclosure for an absurdly small portion of the company so that its employees do not have a complete picture of HP's discriminatory practices.

54.    As part of the WFR, thousands of now former employees selected for termination nationwide are offered a small severance in exchange for signing a "Waiver and General Release Agreement."   But, contrary to the requirements of the OWBPA, the HP employees selected for the WFR are provided a ridiculously small list of the employees and ages of those who are terminated.   Rather than providing a larger department or division wide list comprising the true "decisional unit," HP provided each terminated employee only a tiny fraction of this list, sometimes containing less than 10 employees/ages.    This sparse, deceptive, and

incomplete disclosure clearly violates the OWBPA.  Thus, contrary to the false and express representations HP made to its age protected employees, every employee in the Age Protected Class who signed HP's Waiver and General Release Agreement  may nevertheless participate in this class action because the release is unenforceable pursuant to the OWBPA.

55.    Notwithstanding the foregoing, even a preliminary investigation into those sparse and incomplete disclosures of the ages of employees selected for termination and the signing of a Waiver and General Release Agreement reveal that older employees were substantially overrepresented for selection for termination under the WFR.  In other words, available data shows that older workers were substantially more likely than younger workers to be terminated under the WFR.

**HP Executed the Workforce Reduction Plan That Targeted Older Employees.**

56.    By May of 2020, HP was still consistently eliminating the jobs of older, age-protected employees, like Mr. Reddick, and actively replacing them with younger employees.

57.    Consistent with HP's strategy to eliminate the older members of its workforce in favor of younger workers, when selecting which employee to terminate under its WFR, HP's goal is to single out those workers who it thinks "will not fit the bill long term in [the] team growing to [an advisory] position."

19

58.     Although allegedly neutral on its face, HP's terminations under its WFR are actually targeted to discriminate and eliminate older, age-protected workers in grossly disproportionate numbers.   The WFR does not take into account performance reviews or evaluations, so the employee selected for the Workforce Reduction Plan is not based on merit, but based merely on age.

59.     HP's Workforce Reduction Plan is implemented on a rolling basis.  That is, it does not terminate HP's employees all at once.  But, it serves as a mechanism for HP to terminate members of a protected class of employees whenever it wants.  HP is still engaged in the systematic elimination of its age protected class of employees.   That is, the discriminatory acts originally commenced with the implementation of the WFR in 2012 and those discriminatory acts continue to this day, perpetrated by the decisionmakers of HP's WFR.

**HP's "Fake" Measures that Purportedly Helped Terminated Employees in the Age Protected Class to Retain Employment or be Rehired in a Different Capacity were Illusory.**

60.     Theoretically, HP employees terminated under the Workforce Reduction Plan were and are "encouraged" to apply for other jobs for a limited amount of time.   Specifically, HP has a two-week "Redeployment Period" and a 60-day "Preferential Rehire Period."

61.     During the two-week Redeployment Period, if an employee was able to successfully find a job at HP, s/he would be allowed to continue work without

interruption.  If a HP employee was unable to find another job within his/her two-week Redeployment Period, however, that employee enters into the "Preferential Rehire Period."  The Preferential Rehire Period was 60 days.  If an HP employee was hired during the Preferential Rehire Period, then s/he would be rehired without having to undertake the approval process normally required for a rehire.  While the Preferential Rehire Period is supposed to be neutral in its application, it is not applied neutrally because it adversely impacts disproportionate numbers of age protected employees. In fact, during the Preferential Rehire Period, HP's older employees are almost never rehired. If older employees are even offered a job, the job is rarely, if at all, comparable to the one that employee held before he or she was terminated.

62.    Since August 2013, HP's Human Resources has incorporated written guidelines that require HP to hire mostly younger employees. Specifically, those guidelines state: "New corporate requisition policy requires 75% of all External hire requisitions be 'Graduate' or 'Early Career' employees."  Thus, age-protected employees who were terminated under the WFR and who sought rehiring under the Preferential Rehiring Period, were fighting an uphill battle against HP's inherent prerogative to hire a disproportionate percentage of younger "early career" and

"recent graduates".[3] Thus, available job postings included discriminatory language that made clear that HP was looking for a "younger" employee to fill those available jobs. Accordingly, age-protected employees were rejected for rehiring under the Preferential Rehire Period provision of the WFR in disparately greater numbers than their younger peers who applied either externally or pursuant to the Preferential Rehire Period provision. Older employees were well aware of the fact that many of their age-protected peers had been selected for termination under the WFR. In the engineering support group, older employees would advise each other not to disclose their age or how long they had worked at HP in order to avoid being selected for termination under the WFR.

63.    On or about May 11, 2020, Mr. Reddick was notified by his manager that his employment was being terminated pursuant to the WFR, and that his termination date would be May 22, 2020. Attached as Exhibit "B" and incorporated herewith is a true and correct copy of the Notification and Severance Materials notice HP sent to Mr. Reddick. HP expressly informed Mr. Reddick that "Two weeks after your designated last day of employment, a Waiver and General Release Agreement will be sent to your personal email address. *You **must** sign and return this waiver*, unaltered, per the instructions stated on the waiver agreement." (*See*, Exhibit "B".

---

[3] Notably, the Equal Employment Opportunity Commission views the use of "new grad" and "recent grad" in job notices to be illegal because it discourages older applicants from applying.

Emphasis added.)   Accordingly, Mr. Reddick was presented with HP's unlawful and deceptive Waiver and General Release Agreement and informed he had until July 21, 2020 to sign the agreement and waive/release all of his claims in exchange for $3,367.38. (*See*, Exhibit "B").

64.    In his Notification and Severance Materials, was an attachment identifying only by job title and age those employees that had been selected to participate in the WFR.   And, although its application is worldwide, Plaintiff only received a very limited list of employees who were selected and not selected to participate in the WFR.   To accomplish its deceit, HP uses deceptive language in its "Attachment A" to the Notification of Termination and Severance Materials."   As an example, the OWBPA disclosure states the following:

> Enclosed is a listing of the ages and job titles of the Company's employees in the employee's decisional unit of the employee's organization, as of 05/11/2020, who are (1) eligible for the WFR Plan or MSA Program, but have not been selected to be terminated and have not been offered severance benefits or (2) eligible for the WFR Plan or MSA Program and have been selected to be terminated and offered severance benefits pursuant to the respective Plan or Program.

Ex. B (emphasis added).

65.    Although it is utilized on a rolling basis, HP makes its layoff through the WFR seem like an isolated event through the following language, "as of 05/11/2020. […]"

23

66.     Given its sophistication, HP knew or should have known that its Waiver and General Release Agreement that it pressured its terminated age-protected employees to sign was an illegal and unenforceable agreement as against public policy.  Still, HP used this illegal agreement to try to unlawfully pressure its age protected employees – including Mr. Reddick – into waiving all of their claims against HP under the false pretense that it had terminated fewer age-protected employees than it truly had.  Thus, Mr. Reddick was injured by HP's unlawful Waiver and General Release Agreement in that he did not receive any severance compensation because he was unaware what the actual number of age-protected employees were terminated by HP.  Had Mr. Reddick known that the Waiver and General Release would be unenforceable against him, he would have taken the offered severance and pursued his legal rights.   Because of the incomplete information that Mr. Reddick and those other employees selected for the WFR, the OWBPA disclosure made it impossible to knowingly and voluntarily chose whether to sign the Waiver and Release Agreement.  Accordingly, Mr. Reddick and all age-protected employees terminated by HP were first injured by HP's unlawful age discrimination and then injured again by not electing to take the offered severance payments as a result of the deceptively unlawful disclosure and severance documents.  Thus, and as shown in greater detail in paragraph 94 below,

Mr. Reddick's claims clearly meet the typicality requirement for ADEA collective actions.

67.    Under the WFR, from May 11, 2020 to May 22, 2020, Mr. Reddick had a "Redeployment Period" where he could attempt to transition into a different position without interruption.  But, if he was not redeployed to another position, his redeployment would end on May 22, 2020, and then Mr. Reddick would enter the 60-day "Preferential Rehire Period," where he would be allowed to apply for jobs not yet visible to external candidates, and, if hired, not have to undertake the normal approval process required by HP to become an employee.

68.    Mr. Reddick was informed that he would have the two-week deployment period and then the 60-day Preferential Rehire Period to find another job at HP.  If he was able to successfully find another position during that time, then he would be allowed to continue to work without interruption.  If he was not able to find another position at HP within the redeployment period, then he would be terminated and the 60-day "Preferential Rehire Period" would commence.

69.    Mr. Reddick applied for at least nine jobs at HP during the Redeployment and Preferential Rehire Period as well as outside the aforementioned time periods. But, Mr. Reddick has been rejected from all of these positions.   HP's discriminatory practices against Mr. Reddick and the Age Protected Class continue to this day.  To wit, they do not rehire members of the Age Protected Class during

the Preferential Rehire Period as well as outside the Preferential Rehire Period.

The following are examples of those jobs for which he applied but for which HP

refused to hire Mr. Reddick:

> a.      On or about 12/12/2019 Mr. Reddick applied for the position of Technical Consultant at GreenLake, but was denied that position.

> b.      On or about 5/13/2020 Mr. Reddick applied for the position of GreenLake Management Services Tier 2, but was denied this position and informed by a manager that Mr. Reddick was no longer a candidate for the position.

> c.      On or about 7/3/2020 Mr. Reddick applied for the following positions: Exchange SME 1, Communications Specialist, and Technical Consultant.  But, Mr. Reddick was denied each of these positions.

> d.      On or about 7/15/2020, Mr. Reddick applied for the following positions: Senior Network Software Engineer, Test Engineer, and IT Specialist, PMO Center of Excellence.  But, Plaintiff was was denied each of these positions.

> e.      On or about 7/21/2020, Mr. Reddick applied for the following positions: Cloud Networking Solutions Consultant and Production Test Technician, but was also denied these positions.

70.   Other HP employees in the Age Protected Class have also applied for numerous job positions during the Redeployment and Preferential Rehire Period as well as outside the aforementioned time periods.   Due to its discriminatory practices, however, HP does not hire these individuals, which continue to this day.

71.   While the Redeployment and Preferential Rehire Period is supposedly to be neutral in its application, it is not applied neutrally.   Rather, it systematically

targets and adversely impacts disproportionate numbers of age protected employees.

72.    In fact, during the Preferential Rehire Period, HP's older employees are almost never rehired.  If older employees are even offered a job, the job is rarely, if at all, comparable to the one that employee held before he or she was terminated. And, worse yet, after the Preferential Rehire Period is over, per HP policy that age protected employee can never be rehired by HP again.  This policy continues to cause injury to Mr. Reddick as he is actively continuing to seek gainful employment and reemployment with HP.   But, pursuant to HP's own internal policy, is prohibited from working at HP again, severely limiting his options for gainful employment.

73.    Moreover, since August 2013, HP's Human Resources Department has incorporated written guidelines that require HP to hire mostly younger employees. Specifically, those guidelines state: "New corporate requisition policy requires 75% of all External hire requisitions be 'Graduate' or 'Early Career' employees." Thus, HP employees in the Age Protected Class who were terminated under the WFR and who sought rehiring under the Preferential Rehiring Period, were

fighting an uphill battle against HP's inherent bias to hire a disproportionate percentage of younger "early career" and "recent graduates."[4]

74.   Thus, available job postings included discriminatory language that made clear that HP was looking for a "younger" employee to fill those available jobs. Accordingly, age-protected employees were rejected for rehiring under the Preferential Rehire Period provision of the WFR in disparately greater numbers than their younger peers who applied either externally or pursuant to the Preferential Rehire Period provision.

75.   HP also implemented an early retirement program in which employees of a certain age and tenure are eligible to "voluntarily" retire early.  If the employee does not choose voluntary early retirement, he or she may soon be unemployed. This retirement program presents age-protected employees with a Hobson's choice: either participate in the voluntary retirement program or risk being terminated under the Workforce Reduction Plan.  The aforementioned dilemma works to HP's advantage and to the Age Protected Class' detriment.

76.   So, in addition to the WFR, when the Age Protected Class selected for the WFR are looking for jobs they are purposefully deterred from applying because of the job descriptions insinuating that only younger employees would be considered.

---

[4] Notably, the Equal Employment Opportunity Commission views the use of "new grad" and "recent grad" in job notices to be illegal because it discourages older applicants from applying.

77.     Further, HP intends that a number of employees will accede to the early retirement program because those same employees will fear that otherwise they will be selected for the WFR.

**HP Has Deliberately Avoided Confronting the Reality that Its Policies Disproportionately Impact Age Protected Employees.**

78.     Older employees were well aware of the fact that many of their age-protected peers had been selected for termination under the WFR.  By way of illustration, in the engineering support group, older employees would advise each other not to disclose their age or how long they had worked at HP in order to avoid being selected for termination under the WFR.

79.     HP has an "Adverse Impact Team" that evaluates various HP employment practices to determine whether or not those practices impact a significant number or percentage of a particular protected class of employees – *e.g., gender, race, etc.* Although HP has an "Adverse Impact Team," for unknown reasons, it <u>did not</u> and <u>does not</u> investigate the facts related to whether or not the WFR adversely affects a class of *age* protected employees disproportionately.   This omission further evidences HP's callous disregard for its age-protected employees.

80.     According to its "HP 2016 Sustainability Report," HP provides workforce data regarding its diversity in the United States, but tellingly provides no facts about its age-protected workforce data.

81.   On or about February 2017, HP set forth a "diversity mandate" when it hires outside attorneys to defend it from lawsuits.   If a law firm does not fit HP's selective "diversity" requirements then it can withhold ten percent (10%) of the firm's attorneys' fees.   Tellingly, "*age*" is not one of the criteria or factors included in this "diversity mandate."   This omission further evidences HP's devaluation of age-protected class of persons.

82.   According to a January – February 2017 article published by AARP, HP has received more allegations of age discrimination than any other technology company in recent years. *See* Exhibit C.

## CLASS/COLLECTIVE ALLEGATIONS

83.   Plaintiff sues on his own behalf and on behalf of a Class or Collective of persons similarly situated pursuant to Fed. R. Civ. P. Rule 23.

84.   Plaintiff is a representative of the following collective for the purposes of the Age Discrimination in Employment Act of 1967, 29 U.S.C. sections 621-634 ("ADEA"):

### The Nationwide Class

All current, former, or prospective employees who worked for HP in the United States between November 4, 2016 and present for individuals terminated in deferral states; and on or after March 4, 2017 to present for individuals in non-deferral states; and who were at least 40 years old at the time HP selected them for termination under HP's Workforce Reduction Plan. (the "Nationwide Class").   Excluded from the Nationwide Class are those individuals who "opt-in" to the *Forsyth, et al. v. HP, Inc., et al.*, case number 5:16-cv-04775-EJD.

85.    This action has been brought and may properly be maintained as a collective action, pursuant to 29 U.S.C. § 216(b) and for the reasons explained herein. Counts for violations of the ADEA may be brought and maintained as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by Plaintiff, because their claims are similar to the claims of the members of their respective Nationwide Collective.  Plaintiffs and the members of the Nationwide Class are similarly situated because, among other things, (i) they all worked for Defendants and are all aged 40 and older, (ii) they are all residents of the United States, (iii) they were all subjected to the same company-wide policies of age discrimination, (iv) they were all subjected to the same company-wide policies that adversely impacted them because of their age, (v) they were all terminated pursuant to the WFR and the other of Defendant's policies cited in this Complaint which disproportionately resulted in the termination of age-protected workers, WFR Plans because of their age, (vi) they were all never rehired by HP; and (vii) they were all provided the same deceptive disclosure and Waiver and General Release Agreement that violated the OWBPA along with their release agreement. For instance, HP used its policies and practices (e.g., its Workforce Reduction Plan, and accompanying Preferential Rehire Period, rehiring practices, deceptive OWBPA disclosure) to subject Plaintiff and each member of the Nationwide Class

to identical unfair, unlawful, deceptive, and/or fraudulent business practices, acts, and/or omissions.

86.     Mr. Reddick was injured not only by HP's unlawful discrimination as set forth above, but also by HP's deceptively unlawful Waiver and General Release Agreement, thus, his claims are "typical" of all of those others in the Age Protected Class, regardless of whether or not they ultimately signed the unlawful Waiver and General Release Agreement.  (*See, Wells v. Preferred Fin. Sols.*, No. 5:11-CV-422(MTT), 2013 U.S. Dist. LEXIS 176896, at *23 (M.D. Ga. Dec. 17, 2013) (where some putative class members signed an arbitration agreement, "the fact that some putative class members may be subject to this special defense does not preclude class certification.");  *see, Mora v. Harley-Davidson Credit Corp.*, No. 1:08-cv-01453-AWI-BAM, 2012 U.S. Dist. LEXIS 49636, at *39 (E.D. Cal. Apr. 6, 2012), (holding that the fact that some putative class members signed release and arbitration agreements does not prevent a finding of commonality and predominance sufficient for certification.); *see, Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 681 (N.D.Cal. 2011) (the fact that some members of a putative class have released claims against a defendant does not bar class certification.)  *cf. Bond v. Fleet Bank (RI), N.A.*, 2002 U.S. Dist. LEXIS 22324, 2002 WL 31500393, at *7 (D.R.I.) (noting valid arbitration agreements with some putative class members may require the creation of subclasses or the elimination of certain

members from the class, but they did not prevent the court from certifying the class).

87.    Mr. Reddick's claims clearly meet the "typicality" standard for ADEA collective actions and the fact that some putative class members signed the Waiver and General Release Agreement does not defeat certification here.  Plus, while, "commonality" and "predominance" are not even requirements for certification of ADEA collective actions, Mr. Reddick's claims clearly raise predominant common questions concerning HP's unlawful age discrimination policies and practices and its policy and practice of attempting to obtain waivers/releases of its age-protected employees' claims under false pretenses.  In other words, Plaintiff alleges a single scheme of age discrimination initiated at the very top and carried out through HP's uniform policies/practices across the entire structure of Defendants' organization that continues to this day, regardless of where each individual worked or to which manager the individual reported.

88.    The following common questions apply to these employees, thus confirming they are similarly situated:

• Whether HP unlawfully terminated members of the Nationwide Collective in violation of the ADEA;

• Whether HP's policies or practices relating to the WFR were based on discriminatory intent towards employees over 40 who were otherwise qualified for those positions;

- Whether HP's WFR had a disproportionate adverse impact on its employees aged 40 or older;

- Whether HP's policy of selecting employees to terminate under its WFR had a disproportionate adverse effect on those employees aged 40 or older;

- Whether HP's termination selection policy (i.e., the WFR) was a substantial factor in causing the Class member terminations (i.e., harm);

- Whether HP failed to adequately investigate, respond to, and/or appropriately resolve instances of age discrimination in the workplace;

- Whether HP failed to implement policies and practices to prevent discrimination against older employees.

- Whether an alternative or modification to the WFR existed that would have had less of an adverse impact on employees aged 40 years and older;

- Whether HP's policy and practice of disproportionately refusing to rehire age protected employees who had been terminated pursuant to the WFR violated the ADEA; and

- Whether HP's policy and practice of failing to provide the proper "decisional unit" of employees and ages for employees selected for a severance/waiver agreement pursuant to the Workforce Reduction Plan violated the OBPA or was an unfair, unlawful, deceptive, and or fraudulent business practice – particularly when coupled with HP's efforts to pressure its age-protected employees to sign its Waiver and General Release Agreement.

- Whether the Waiver and Release Agreement was capable of being "knowing and voluntarily" agreed to.

///

///

89.   Plaintiff is also a representative of the following Georgia Statewide class:

<u>The Georgia Class</u>

All current, former, or prospective employees who worked for HP in the State of Georgia between November 10, 2018 and present who were at least 40 years old at the time HP selected them for termination under HP's Workforce Reduction Plan. ("Georgia Class").

90.   This action has been brought and may properly be maintained as a class action, under Fed. R. Civ. P. Rule 23 because a well-defined community of interest in the litigation exists and because the proposed class is easily ascertainable, and for the other reasons explained in this Class Action Complaint.

91.   <u>Numerosity</u>:  The persons who comprise the Georgia Class are so numerous that joinder of all such persons would be unfeasible and impracticable.   The Georgia Class consists of hundreds of former employees who were notified of their termination when they were age 40 and older.

92.   <u>Commonality</u>:  Common questions of fact or law arising from HP's conduct exist, as described in this Complaint, as to all members of the Georgia Class which predominate over any questions solely affecting individual members of the proposed class, including but not limited to:

• Whether HP's policies or practices relating to the WFR were based on discriminatory intent toward its Georgia employees aged 40 and over who were otherwise qualified for those positions;

• Whether HP's WFR had a disproportionate adverse impact on its Georgia employees aged 40 or older;

35

•     Whether HP's policy of selecting employees to terminate under its Workforce Reduction Plan had a disproportionate adverse effect on those Georgia employees aged 40 or older;

•     Whether HP's termination selection policy (i.e., the WFR) was a substantial factor in causing the Georgia Class member terminations (i.e., harm);

•     Whether HP failed to adequately investigate, respond to, and/or appropriately resolve instances of age discrimination in the workplace in Georgia;

•     Whether HP failed to implement policies and practices to prevent discrimination against older employees in Georgia.

•     Whether an alternative or modification to the WFR existed that would have had less of an adverse impact on employees in Georgia aged 40 years and older; and

•     Whether HP's policy and practice of failing to provide the full list of employees and ages for employees selected for a severance/waiver agreement pursuant to the WFR violated the OWBPA or was an unfair, unlawful, deceptive, and or fraudulent business practice under Georgia law – especially when coupled with HP's attempt to persuade its age-protected employees to sign its Waiver and General Release Agreement.

93.    HP's defenses, to the extent that any such defense is applied, are applicable generally to the Georgia Class and are not distinguishable to any degree relevant or necessary to defeat predominance in this case.  Thus, for all of the reasons stated in this Complaint above, common issues predominate.

94.    Typicality:  In addition to all of the reasons already stated above, Plaintiff's claims are typical of the claims for the members of the Georgia Class all of whom

have sustained and/or will sustain injuries, including irreparable harm, as a legal (proximate) result of HP's common course of conduct as complained of in this operative complaint.  Plaintiff's class claims are typical of the claims of Georgia Class because HP used its policies and practices (i.e., its WFR, and the Preferential Rehire Period therein,) to subject Plaintiff and each member of the Georgia Class to identical unfair, unlawful, deceptive, and/or fraudulent business practices, acts, and/or omissions.

95.   Adequacy:  Plaintiff, on behalf of all others similarly situated, will fairly and adequately protect the interests of all members of the Georgia Class in connection with which they have retained competent attorneys.  Plaintiff is able to fairly and adequately protect the interests of all members of the Georgia Class because it is in Plaintiff's best interests to prosecute the claims alleged herein to obtain full compensation due to them.  Plaintiff does not have a conflict with either the Georgia Class members, and his interests are not antagonistic to either of the Georgia Class.  Plaintiff has retained counsel who are competent and experienced in representing employees in complex class action litigation

96.   Superiority:  Under the facts and circumstances set forth above, class action proceedings are superior to any other methods available for both fair and efficient adjudication of the controversy.  A class action is particularly superior because the rights of each member of the Georgia Class, inasmuch as joinder of individual

members of either Class is not practical and, if the same were practical, said members of the Georgia Class could not individually afford the litigation, such that individual litigation would be inappropriately burdensome, not only to said citizens, but also to the courts of the State of Georgia.

97.   Litigation of these claims in one forum is efficient as it involves a single decision or set of decisions that affects the rights of thousands of employees.  In addition, class certification is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgment concerning HP's practices.

98.   To process individual cases would increase both the expenses and the delay not only to members of the Georgia Class, but also to HP and the Court.   In contrast, a class action of this matter will avoid case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of each member of the Georgia Class, all by way of the comprehensive and efficient supervision of the litigation by a single court.

99.   This case is eminently manageable as a class.  HP's computerized records, including meticulous payroll and personnel data, provide an accurate and efficient means to obtain information on the effect and administration of the WFR *en masse*,

including class-wide damages, meaning class treatment would significantly reduce the discovery costs to all parties.

100.   In particular, since HP is obfuscating the import of its WFR, misleading its employees, suppressing their wages and mobility, the Georgia Class is neither sophisticated nor legally knowledgeable enough be able to obtain effective and economic legal redress unless the action is maintained as a class action.  Given the unlikelihood that many injured class members will discover, let alone endeavor to vindicate, their claims, class action is a superior method of resolving those claims.

101.   For the reasons already stated above, there is a community of interest in obtaining appropriate legal and equitable relief for the statutory violations and other improprieties, and in obtaining adequate compensation for the damages and injuries which HP's actions have inflicted upon Plaintiff and the Georgia Class.

102.   There is also a community of interest in ensuring that the combined assets and available insurance of HP are sufficient to adequately compensate the members of the Georgia Class for the injuries sustained.

103.   Notice of the pendency and any result or resolution of the litigation can be provided to members of the Georgia Class by the usual forms of publication, sending out to members a notice at their current addresses, establishing a website where members can choose to opt-out, or such other methods of notice as deemed appropriate by the Court.

104.   Without class certification, the prosecution of separate actions by individual members of the Georgia Class would create a risk of: (1) inconsistent or varying adjudications with respect to individual members of Georgia Class that would establish incompatible standards of conduct for HP; or (2) adjudications with respect to the individual members of the Georgia Class that would, as a practical matter, be disparities of the interests of the other members not parties to the adjudication, or would substantially impair or impede their ability to protect their interest.

## FIRST CLAIM FOR RELIEF - AGE DISCRIMINATION UNDER ADEA

### (On behalf of Plaintiff and the Nationwide Class)

105.   Plaintiff incorporates by reference all Paragraphs of this Complaint as if fully set forth herein.

106.   At all times relevant to this case, Plaintiff and the Nationwide Class has been at least 40 years of age and therefore protected by the ADEA, 29 U.S.C. §§ 621 – 634.

107.   At all times relevant to this case, Defendants were "employers" within the meaning of the ADEA, 29 U.S.C. § 630(b).

108.   Although Plaintiff and the Nationwide Class have at all relevant times successfully performed their jobs, and were terminated because of his age and replaced by younger employees.

109.   Based on the above-described acts, practices, and omissions, Defendants engaged in unlawful discrimination under the ADEA based on Plaintiff's age.

110.   Furthermore, Defendants' illegal actions against Plaintiff and the Nationwide Class were aimed at them because of their age, resulting in adverse impacts to the terms and conditions of their employment.

111.   Defendants' above-described conduct was intentional and was motivated by the ages of Plaintiff and the Nationwide Class members and constitutes a willful violation of the ADEA.

112.   Defendants knowingly and willfully engaged in the above-described conduct and discriminatory termination of Plaintiff and the Nationwide Class on the basis of their age.  The EEOC charge placed HP on notice that a collective action was forthcoming regarding its discriminatory practices perpetrated on Plaintiff and those similarly situated that consistently continue to this day.

113.   As a direct and proximate result of Defendants' above-described actions, Plaintiff and the Nationwide Class have suffered damages, including lost wages and benefits,  and they are entitled to  economic damages, and attorneys' fees and costs as permitted by law.

///

///

///

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of himself individually and on behalf of the Class prays for relief and judgment against Defendants and any later named defendant, jointly and severally as follows:

1.     Certification of this case as a collective action under the ADEA;

2.     Certification of the case as a class action and appointment of Plaintiff as Class Representative for the United States Class and his counsel of record as Class Counsel;

3.     Certification of the case as a class action and appointment of Plaintiff as Class Representative for the Georgia Class and his counsel of record as Class Counsel;

4.     All damages to which Plaintiff and each member of the United States and Georgia Classes are entitled due to Defendants' conduct, including, but not limited to, back pay, front pay, general and special damages for lost compensation and job benefits that they would have received but for the discrimination practices of Defendants;

5.     For restitution, including, without limitation, restitutionary disgorgement;

6.     For affirmative or prospective relief;

7.     For attorneys' fees, expenses, and costs of suit;

8.     For pre-judgment and post-judgement interest;

9.     Awarding such other and further relief, including but not limited to declaratory or injunctive relief; and

10.   For all such other and further relief the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial.

DATED: November 10, 2020.

Respectfully submitted,

HILL, KERTSCHER & WHARTON, LLP

By:   /s/ Douglas R. Kertscher
      Douglas R. Kertscher
      Georgia State Bar No. 416265
      3350 Riverwood Parkway
      Suite 800
      Atlanta, Georgia 30339
      Telephone:  770-953-0995
      Facsimile:  770-953-1358
      E-mail:      drk@hkw-law.com

      **HOGUE & BELONG**

      /s/ *Jeffrey L. Hogue*
      Jeffrey L. Hogue
      (*pro hac vice forthcoming*)
      jhogue@hoguebelonglaw.com
      Tyler J. Belong
      (*pro hac vice forthcoming*)
      tbelong@hoguebelonglaw.com
      Marisol Jimenez Gaytan
      (*pro hac vice forthcoming*)

mjimenez@hoguebelonglaw.com

Attorneys for Plaintiff Reddick on
behalf of himself and all others
similarly situated
c/o Hogue & Belong, APC
170 Laurel Street San Diego, CA
92101
(619) 238-4720