IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| GARFIELD REDDICK, on behalf of himself individually and all others similarly situated,<br><br>　　　Plaintiff,<br><br>v.<br><br>HEWLETT-PACKARD COMPANY; HP ENTERPRISE SERVICES, LLC; HEWLETT-PACKARD ENTERPRISE CO.; HP, INC.; and DXC TECHNOLOGY SERVICES, LLC,<br><br>　　　Defendants. | CIVIL ACTION NO.<br>1:20-cv-04597-LMM-RDC |

## **FINAL REPORT AND RECOMMENDATION**

Defendants Hewlett-Packard Company ("HP Co."), HP Enterprise Services, LLC ("ES"), Hewlett-Packard Enterprise Co. ("HPE"), HP, Inc. ("HPI"), and DXC Technology Services, LLC ("DXC") (collectively, "Defendants")[1] have filed a motion to compel arbitration, or alternatively, to dismiss this putative collective

---

[1] Plaintiff generally does not distinguish between the individual Defendants but instead refers to them collectively as "Defendants" or "HP." As described below, Plaintiff alleges that all of the named entities together constitute a "single integrated" employer or "joint employer." Accordingly, for present purposes, the undersigned will distinguish between Defendants only as necessary.

action alleging violations of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, *et seq.* ("ADEA"). (Doc. 29). For the reasons that follow, the undersigned **RECOMMENDS** that Defendants' motion to compel be **GRANTED**, and that their alternative motion to dismiss be **DENIED AS MOOT**.

## I. BACKGROUND

### A. *Factual Background*

This case concerns the lawfulness of Defendants' workforce policies and practices. Plaintiff Garfield Reddick, a former employee suing on behalf of himself and two putative collectives of similarly situated employees, alleges that Defendants unlawfully discriminated against him and others aged 40 and older. For present purposes, except as otherwise noted, the facts herein are taken from Plaintiff's complaint (Doc. 1).

According to Plaintiff, Defendants are separate entities in name only as they are in, in fact, "interrelated and integrated" into a single commercial enterprise sharing "common control, management, resources, and employment policies." (Doc. 1 ¶¶ 6, 7, 12, 16). The family tree looks like this. In 2015, HP Co. split into two companies—HPI and HPE. (*Id.* ¶ 13). HPE is the parent company of ES, which, in turn, is the parent of DXC. (*Id.* ¶ 5). HPI and HPE are headquartered in and principally operated out of California; however, another one of Defendants' headquarters is located in Alpharetta, Georgia. (*Id.* ¶¶ 4, 14). Based on the just-

described corporate structure, coupled with the alleged unity of corporate control and workforce policies, Plaintiff claims that Defendants operate either as a "single integrated" employer or a "joint employer" for ADEA purposes.[2] (*Id.* ¶¶ 7, 12, 16).

Principally at issue in this case is one particular common policy—specifically, a workforce reduction plan (the "WFR"). (*Id.* ¶¶ 8–9, 11, 30–31). Plaintiff alleges that the WFR was first instituted by HP Co. in 2012 but continues in practice to the present day, and that it is uniformly implemented across the operations of its corporate progeny through Defendants' coordinated efforts. (*Id.* ¶¶ 8, 10, 11, 30, 40–41, 59). The long and short of Plaintiff's allegations is that the WFR is "a scheme to terminate older employees in favor of younger ones." (*Id.* ¶¶ 30, 87). Though ostensibly justified as a cost-cutting measure to promote business stability and facilitate investment in innovation, according to Plaintiff, Defendants in fact deployed the WFR as pretext to systematically target older employees principally through regular, periodic layoffs. (*Id.* ¶¶ 31, 48, 59).

Plaintiff was first hired by HPE as an independent contractor in July 2017, and he was subsequently promoted to a full-time employee as a technical solutions

---

[2] A "single employer" or "integrated enterprise" is present where "two ostensibly separate entities are highly integrated with respect to ownership and operations," while a "joint employer" is present where "two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees." *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999) (quotations and citations omitted).

consultant in February 2018, at the age of 55.[3] (*Id.* ¶ 23). However, on or about May 11, 2020, Plaintiff was notified that he would be laid off pursuant to the WFR, and he was officially terminated on May 22, 2020. (*Id.* ¶¶ 32, 63; Doc. 1-2). Plaintiff cites statements from corporate executives as well as statistics regarding the median age of Defendants' workforce and the age of WFR-terminated employees to show that he was not the lone victim of Defendants' policy. (Doc. 1 ¶¶ 37, 42–45, 50, 55).

Following his termination, on or before August 31, 2020, Plaintiff filed an EEOC charge against Defendants alleging a pattern and practice of unlawful age-related terminations. (*Id.* ¶ 21). The EEOC issued Plaintiff a right-to-sue letter on September 17, 2020. (*Id.*; Doc. 1-1).

## B. Procedural Background

### i. Plaintiff's Complaint

On November 10, 2020, less than ninety days after Plaintiff received the EEOC's right-to-sue letter, Plaintiff initiated the instant case. (Doc. 1). Claiming that the WFR was merely pretext for a longstanding business practice of age discrimination, Plaintiff filed this action against Defendants under the ADEA. Plaintiff claims that he and other employees aged 40 and older were disparately

---

[3] Plaintiff alleges only that he was hired by Defendants. (Doc. 1 ¶ 23). However, the severance materials attached to his complaint show that he was employed by HPE, specifically. (Doc. 1-2). Plaintiff was born on January 9, 1963. (Doc. 1 ¶ 22).

treated and impacted through the denial of advancement opportunities, termination, and the failure to redeploy or rehire.

Pursuant to 29 U.S.C. § 216(b),[4] Plaintiff purports to represent two separate collectives—a nationwide collective and a local Georgia state collective, respectively, described as follows:

The Nationwide Class

> All current, former, or prospective employees who worked for HP in the United States between November 4, 2016 and present for individuals terminated in deferral states; and on or after March 4, 2017 to present for individuals in non-deferral states; and who were at least 40 years old at the time HP selected them for termination under HP's Workforce Reduction Plan. (the "Nationwide Class"). Excluded from the Nationwide Class are those individuals who "opt-in" to the *Forsyth, et al. v. HP, Inc., et al.*, case number 5:16-cv-04775-EJD.[5]

---

[4] The requirements for bringing a collective action under the ADEA are "are independent of, and unrelated to, the requirements for class action under Rule 23 of the Federal Rules of Civil Procedure." *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 n.12 (11th Cir. 1996). The ADEA provides that it is to be enforced "in accordance with the powers, remedies and procedures" of the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 626(b). The FLSA, in turn, provides, in pertinent part: "An action . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).

[5] Another putative ADEA collective action premised on similar allegations as those asserted here, *Forsyth et al v. HP Inc. et al*, Civ. No. 5:16-cv-04775-EJD, was initiated against HPI and HPE in the United States District Court for the Northern District of California in August 2016 and remains ongoing. On April 13, 2021, the District Court in *Forsyth* granted the plaintiffs' motion for preliminary certification of two nationwide collectives in that case. (ECF 423). Thus, as asserted here, Plaintiff's putative nationwide collective in this matter would exclude any individuals opting-in to the *Forsyth* collectives pursuant to 29 U.S.C. § 216(b). Notably, Plaintiff's counsel also represents a separate plaintiff in yet another putative ADEA collective action, *Cochran v. Hewlett-Packard Company et al.*, Civ. No. 1:20-cv-01235-RM-MEH, filed against several of the Defendants in the District Court for the District of Colorado. On March 4, 2021, the District Court in *Cochran* administratively closed that action pending the resolution of *Forsyth* in light of the "first-to-file rule" applicable to concurrent federal judicial proceedings. (ECF 65). Arbitration was not at issue in *Cochran*.

(Doc. 1 ¶ 84).

The Georgia Class

All current, former, or prospective employees who worked for HP in the State of Georgia between November 10, 2018 and present who were at least 40 years old at the time HP selected them for termination under HP's Workforce Reduction Plan. ("Georgia Class").

(*Id.* ¶ 89).

## ii. *Defendants' Motion to Compel Arbitration*

On February 1, 2021, Defendants filed the pending motion to compel plaintiff to arbitrate his claims or, in the alternative, to dismiss this action pursuant to Rule 12(b)(6) for failure to state a claim. (Doc. 29). According to Defendants, as a condition of his employment, Plaintiff agreed at the time of hiring to arbitrate all employment claims exclusively through individualized proceedings.

In support of their motion, Defendants have submitted the declaration of Elizabeth Guzman Ljubetic (the "Ljubetic Declaration"), HPE's former Global Talent Acquisition Operations & Strategy Consultant and current Human Resources Business Partner, in which she swears to the following as applicable to the relevant time period: (1) she oversaw the process by which new HPE employees were issued and accepted employment offers; (2) all HPE job applicants were required to create an individualized, password-protected candidate account on the company's enterprise management system; (3) offer letters and attached arbitration agreements were electronically published to and viewable by successful applicants via such

individual accounts; (4) in order to accept an employment offer, successful applicants were required to affirmatively click an acceptance button with respect to both the offer letter and the attached arbitration agreement via their individual accounts, after which the date and time of acceptance were automatically electronically recorded; (5) failure to accept the arbitration agreement would have precluded an applicant's acceptance of the accompanying offer letter; and (6) as a custodian of HPE's records, those records show that Plaintiff electronically accepted his offer letter (the "Offer Letter")[6] and attached arbitration agreement (the "Arbitration Agreement") at 9:31:44 a.m. EST on the morning of January 18, 2018 via his individual candidate account. (Doc 29-2 at 1–3).

Attached to the Ljubetic Declaration are copies of Plaintiff's Offer Letter and Arbitration Agreement, each of which is certified as true and correct by Ljubetic. As relevant here, the Offer Letter provides:

> *Arbitration Agreement.* This offer and your employment are also conditional upon you reviewing and agreeing to the Mutual Agreement to Arbitrate Claims. . . . Please review the Mutual Agreement to Arbitrate Claims enclosed below.

* * * *

---

[6] In addition to the Arbitration Agreement, the documents attached to the Ljubetic Declaration include a basic offer letter dated January 16, 2018 (Doc. 29-2 at 5–7), together with a confidentiality agreement (*id.* at 13–14), letter of assurance (*id.* at 15), and rules regarding prior employers (*id.* at 16–17). For simplicity, all of these documents aside from the Arbitration Agreement are collectively referred to herein simply as the "Offer Letter."

**To accept this offer of employment, please carefully review the enclosed documents and follow the instructions for acceptance below (after enclosed documents).**

* * * *

**Offer of Employment Acceptance**

To accept the offer of employment and agree to the above, click on the "E-sign by Adobe" button and follow the visual prompts to electronically sign the offer letter. Once signed, click the "OK" button to submit your acceptance.

By submitting your acceptance you acknowledge that:

- I accept the above Company's conditional offer of employment.

. . . .

- I have read, understand, and agree to the terms and conditions of the Mutual Agreement to Arbitrate Claims [and other documents] . . . (each of which is enclosed above).

(Doc. 29-2 at 6–7, 17) (emphasis in original). This document bears a generic digital signature in Plaintiff's name, together with his email address. (*Id.* at 17).

For its part, the Arbitration Agreement includes the following pertinent provisions:

**1. Scope of Agreement**. This Agreement applies to any past, present or future dispute arising out of or related to Employee's application, employment and/or separation from employment with the Company[7] and survives after the employment relationship ends. The Agreement applies to any dispute . . . that Employee may have against: (1) the

---

[7] The Arbitration Agreement defines "Company" to include "all direct and indirect parent, subsidiary, partners, divisions, and affiliated entities, and all successors, predecessors, and assigns of any of them." (Doc. 29-2 at 8).

Company. . . . Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration.

\* \* \* \*

**2. Covered Claims**. Except as it otherwise provides, this Agreement applies, without limitation, to disputes or claims arising out of or relating to Employee's employment relationship with the Company, including, but not limited to: (i) discrimination or harassment based on . . . age . . . (iv) all employment related laws, including, but not limited to . . . the Age Discrimination in Employment Act . . . .

\* \* \* \*

**6. Class and Collective Action Waivers**. Employee and the Company agree to bring any dispute in arbitration on an individualized basis only, and not on a class, collective or private attorney general representative action basis.

\* \* \* \*

**11. Confidentiality**. Except as may be permitted or required by law, as determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence, content (including all testimony, information and discovery materials), or results of any arbitration hereunder without the prior written consent of all parties.

(*Id.* at 8, 10–12) (emphasis in original). The Arbitration Agreement does not bear Plaintiff's signature, but it does include personal acknowledgments with his printed name attesting that he has read and agreed to its terms and, further, that his "electronic signature/acceptance of th[e] agreement" shall be binding. (*Id.* at 12).

In response, Plaintiff has submitted his own declaration, to which he has attached only the Arbitration Agreement (sans the Offer Letter). (Doc. 30-2). In his

declaration, Plaintiff swears, upon information or belief, that he "do[es] not recall signing any arbitration agreement nor any document that would result in me waiving my right to a jury concerning my claims against HP." (*Id.* at 2). According to Plaintiff, he "would have remember[ed]" signing such an agreement, but he first learned of the Arbitration Agreement only after this action commenced. (*Id.*). He adds that the Arbitration Agreement does not bear his handwritten signature. (*Id.*).

Defendants' motion is now ripe for review.

## II.    LEGAL STANDARD [8]

The validity of arbitration agreements is generally governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, which was designed "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991); *accord Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005). With "the promise of quicker, more informal, and often cheaper resolutions for everyone involved" as catalyst, the FAA embodies "a liberal federal policy favoring arbitration agreements." *Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1621 (2018) (quotation and citations omitted). Thus, as a general matter, courts "must rigorously enforce arbitration agreements according to their

---

[8] Because the undersigned concludes that the Arbitration Agreement is valid and enforceable, the Court need not address Defendants' remaining arguments for dismissal under Rule 12(b)(6).

terms." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quotation and citation omitted). This judicial enforcement duty under the FAA encompasses agreements to arbitrate statutory claims, like those arising under the ADEA, *see Gilmer*, 500 U.S. at 35, as well as agreements providing exclusively for individualized arbitration proceedings, *see Epic Sys. Corp.*, 138 S.Ct. at 1632.

A reviewing court treats a motion to compel arbitration similarly to a motion for summary judgment. *See Bazemore v. Jefferson Cap. Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016). Under that posture, the court follows a two-step inquiry. *Klay v. PacifiCare Health Sys., Inc.*, 389 F.3d 1191, 1200 (11th Cir. 2004). First, the court must "determine whether the parties agreed to arbitrate the dispute." *Id.* If so, the court must then determine "whether legal constraints external to the parties' agreement foreclosed arbitration." *Id.* (quotation and citation omitted); *see also* 9 U.S.C. §§ 2–4.

The threshold question whether an arbitration agreement exists "is simply a matter of contract between the parties." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Accordingly, when determining whether an arbitration agreement exists, courts generally "should apply ordinary state-law principles that govern the formation of contracts." *Id.* at 944; *accord Caley*, 428 F.3d a 1368. The "federal policy favoring arbitration, however, is taken into consideration even in applying ordinary state law." *Caley*, 428 F.3d a 1368 (citation omitted); *see also*

*Kindred Nursing Ctrs. Ltd. P'Ship v. Clark*, 137 S.Ct. 1421, 1428 (2017) ("[T]he [FAA] cares not only about the 'enforce[ment]' of arbitration agreements, but also about their initial 'valid[ity]'—that is, about what it takes to enter into them.").

With the above in mind, a district court may conclude as a matter of law that the parties entered into an arbitration agreement and compel arbitration only if, after reviewing the evidence under the relevant state substantive law, "there is no genuine dispute as to any material fact" regarding the formation of such an agreement. *Bazemore*, 827 F.3d at 1333; *see also* Fed. R. Civ. P. 56(a). When deciding a question as a matter of law, "[i]t is not the court's role to weigh conflicting evidence or to make credibility determinations." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). However, a factual dispute is not "genuine" if it is not supported by evidence or is created by evidence that is "merely colorable" or "not significantly probative." *Bazemore*, 827 F.3d at 1333.

## III. DISCUSSION

### A. Formation of the Arbitration Agreement

The central question presented here is whether the parties formed an agreement to arbitrate Plaintiff's claims in the first place. In support of compulsory and individualized arbitration, Defendants contend that the parties reached a valid and enforceable agreement to arbitrate his claims, as demonstrated by the Ljubetic Declaration and attached documents, including copies of the Offer Letter and

Arbitration Agreement itself. (Doc. 29 at 5–15; Doc. 31 at 3–7). Opposing arbitration, Plaintiff argues that Defendants have not met their burden to prove such an agreement was actually formed. In that regard, Plaintiff swears that he does not recall seeing or signing the Arbitration Agreement. Further, Plaintiff questions the authenticity of the Arbitration Agreement attached to the Ljubetic Declaration because it lacks other indicia of reliability, such as his handwritten signature or confirmation of electronic access and receipt. (Doc. 30 at 5–9).

It is undisputed that Georgia law governs the central question, and upon consideration, the undersigned finds in Defendants' favor.[9] Under Georgia law, "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1. The present dispute concerns only the element of mutual assent, which may be inferred from the contract language itself and the surrounding circumstances, including the parties' conduct. *See Aaron v. United Health Svcs. of Georgia, Inc.*, 826 S.E.2d 442, 444 (Ga. Ct. App. 2019) (arbitration case); *Extremity Healthcare, Inc. v. Access to Care*

---

[9] The undersigned notes that Defendants incorrectly maintain that a party seeking to avoid arbitration must "unequivocally deny" the existence of an agreement to arbitrate. (Doc. 31 at 4). That is not the governing standard, as the Eleventh Circuit made clear in *Bazemore*, 827 F.3d at 1329–30. In any event, as explained below, the undersigned nevertheless finds that Plaintiff has not raised a genuine question of fact regarding the existence of the Arbitration Agreement under Georgia law.

*Am., LLC*, 793 S.E.2d 529, 536–37 (Ga. Ct. App. 2016) (arbitration case). The party asserting the existence of a valid and enforceable arbitration agreement is the one who bears the burden of proving it. *Triad Health Mgmt. of Georgia, III, LLC v. Johnson*, 679 S.E.2d 785, 788 (Ga. Ct. App. 2009).

There is a conspicuous asymmetry in the evidence on point. To rehash—lining it up, we have the following. Defendants have introduced, on the one hand, evidence showing that during the relevant period, all HPE job applicants were required to create secure individual accounts on Defendants' enterprise management system; that all successful applicants were issued offer letters and attached arbitration agreements through these individual accounts; that in order to accept such employment offers, a successful applicant was required to affirmatively accept the offer letter and accompanying arbitration agreement; and that, as shown by business records kept in the ordinary course, Plaintiff electronically accepted his Offer Letter and the Arbitration Agreement, exact copies of which were also submitted, at precisely 9:31:44 a.m. on January 18, 2018. *See generally* (Doc. 29-2). On the other hand, in response, Plaintiff has submitted only his sworn statement that, although he believes he would have remembered doing so, he does not recall receiving, reviewing, or signing the Arbitration Agreement. *See generally* (Doc. 30-2).

Defendants have carried their burden; meanwhile, Plaintiff's counter-evidence is too slight to bend the inferences in his favor. Under the summary

judgment-like standard that governs, in the face of competent evidence, Plaintiff—as the nonmoving party—may not resist compulsory arbitration solely on the basis of "conclusory allegations without specific supporting facts that have no probative value." *Bazemore*, 827 F.3d at 1333. Instead, he must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted) (emphasis in original). Moreover, although the standard for assessing a genuine dispute of fact requires courts to credit the nonmoving party's evidence and make all reasonable and justifiable inferences in his favor, it does not require the courts to make *all possible inferences* in that direction. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018). Even fully crediting Plaintiff's declaration here, he has not rebutted Defendants' evidence so as to raise a genuine question of fact.

To begin with, Plaintiff's equivocal statement that he does not recall seeing or signing the Arbitration Agreement has only limited probative value, if any. The reason being that it does not directly controvert Defendants' evidence or the corresponding inference in favor of agreement. Moreover, absent a firm evidentiary root, Plaintiff's failure to recall alone cannot plausibly sustain a contrary inference *against* agreement. *See Hogan v. Pearson*, 380 S.E.2d 82, 83 (Ga. Ct. App. 1989) (party opposing enforcement of an agreement did not create a genuine issue of fact concerning formation where his testimony merely questioned the authenticity of the

relevant document and indicated that he could not remember signing it ); *Burke Cnty. Dialysis Ctr., Inc. v. Walters*, 391 S.E.2d 33, 34 (Ga. Ct. App. 1990) (party opposing enforcement of an agreement did not create a genuine issue of fact concerning formation where his affidavit stated only that he did not recall signing the relevant documents and that he did not believe he had done so). In other words, one can accept with perfect consistency—i.e., without factual dispute—that Plaintiff agreed to arbitrate and, at the same time, that he doesn't remember doing so.

Either Plaintiff agreed to the Arbitration Agreement or he did not—Plaintiff's inability to recall, however, cannot settle the issue. The probative value of empty retrospection is curbed by its evidentiary congeniality. Put another way, evidence that is consistent with everything, like Plaintiff's failure to remember here, tends to prove nothing. *Cf.* Fed. R. Evid. 401(a) ("Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence[.]"). Other courts have found as much. *See Hogan,* 380 S.E.2d at 83; *Walters*, 391 S.E.2d at 34; *Megel v. Donaldson*, 654 S.E. 2d 656, 660–61 (Ga. Ct. App. 2007) (investors' claims that they did not remember signing an agreement and their corresponding denials of contract execution did not create an issue of fact concerning the existence of the agreement); *accord Melver v. Check 'N Go of Florida, Inc.*, Case No. 13-20528-CIV-Williams, 2013 WL 12148376, at *2 (S.D. Fla. July 22, 2013) (employee's declaration that he did not recall signing an

arbitration agreement "by itself, fails to invalidate the agreement"); *Garcia v. Harmony Healthcare, LLC*, Case No. 8:20-cv-1065-WFJ-AAS, 2021 WL 1610093, at *4 (M.D. Fla. Apr. 26, 2021) ("[G]eneral denials based on a lack of memory will not rebut a signed written [arbitration] agreement."). And the governing standard demands more. *See Bazemore*, 827 F.3d at 1333; *Reed v. Eastside Med. Ctr.*, 1:19-cv-03967-SDG, 2021 WL 1967407, at *5 (N.D. Ga. May 14, 2021) (Grimberg, J.) (noting that Georgia law "require[s] something more than a lack of recall to create a genuine issue of material fact [as to contract formation] when there is uncontroverted evidence of [a] signature's authenticity."); *Nelson v. State Farm Life Ins. Co.*, 344 S.E.2d 492, 495 (Ga. Ct. App. 1986) (beneficiary's "equivocal circumstantial evidence" regarding a signature's authenticity did not directly contradict evidence supporting the validity of an insurance policy form, so it was insufficient to create a genuine question of material fact on the issue).

To be clear, this is not a case where the moving party has failed to adduce competent evidence to demonstrate an agreement, or where the nonmoving party has unequivocally denied making such an agreement. In either of those cases, an open question of fact regarding formation might remain. *See Bazemore*, 827 F.3d at 1331–32 (genuine question of fact as to the formation of an arbitration agreement remained where party seeking arbitration did not meet its burden of introducing competent evidence of the actual agreement to be enforced); *Virgil v. Kapplin*, 369 S.E.2d 808,

809–10 (Ga. Ct. App. 1988) (genuine question of fact as to contract formation remained where party opposing enforcement submitted an affidavit "flatly" denying execution of the document at issue and also produced expert testimony regarding tampering). But, again, that is not the case here. Instead, Defendants have introduced sworn testimony and documentary evidence concerning the formation and precise terms of the Arbitration Agreement to be enforced. Plaintiff has not directly controverted that evidence. His declaration does not contest Defendants' standardized application and hiring process. It does not contest his creation of a secure and individualized account in connection with that process. Most importantly, it does not contest his receipt and acceptance of the Offer Letter, which *expressly references* (multiple times) and is *conditioned upon* acceptance of the Arbitration Agreement. Plaintiff's declaration states only that, with respect to the Arbitration Agreement alone, he does not recall seeing or signing it. That kind of equivocation is simply not enough to defeat Defendants' motion. *See Hogan,* 380 S.E.2d at 83; *Walters*, 391 S.E.2d at 34.

Further, Plaintiff's belief that he *would have* remembered agreeing to arbitration is, without further foundation, the type of conclusory speculation that cannot raise a genuine question of fact. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on *personal knowledge* . . . .") (emphasis added); *Ellis v. England*, 432 F.3d

18

1321, 1327 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations, as well as affidavits based, in part, upon information and belief, rather than personal knowledge, are insufficient to withstand a motion for summary judgment."); *Pace v. Capobianco*, 283 F.3d 1275, 1278–79 (11th Cir. 2002) ("[A]n affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to . . . create[] a genuine issue of fact about the existence of that certain fact."); *United States v. Stein*, 769 F. App'x 828, 832 (11th Cir. 2019) (party's affidavit that only conveyed her subjective belief rather than personal knowledge about the existence of certain facts was conclusory and had no probative value).

In his endeavor to create a genuine question of fact and resist arbitration, aside from introducing his own evidence on the issue of formation—which the undersigned concludes is not up to the task—Plaintiff also challenges the authenticity of Defendants' evidence. That effort fares no better. According to Plaintiff, the Arbitration Agreement presented with the Ljubetic Declaration cannot be authenticated because it does not bear his handwritten signature. Moreover, Plaintiff claims that the Ljubetic Declaration fails to authenticate the Arbitration Agreement because it lacks necessary factual specifics about how the document was presented to Plaintiff and whether he actually accessed and received it. On that point, Plaintiff points out that the Arbitration Agreement itself does not include a stamp

indicating the date and time of his purported acceptance, nor the IP address used to electronically confirm such acceptance. (Doc. 30 at 5–8).

The undersigned concludes that the Ljubetic Declaration and its attachments, including the Arbitration Agreement, may be properly considered, and further, that Plaintiff has failed to cast genuine doubt as to authenticity. *See* Fed. R. Civ. P. 56(c); Fed. R. Evid. 803(6), 901(a). It is not the Court's role here to resolve genuine conflicts in the record, but merely to identify them if present. *Mize*, 93 F.3d at 742. In that regard, the issues are whether, in light of Plaintiff's challenges, Defendants' evidence should be disregarded entirely in the first instance or, if not, whether Plaintiff has nevertheless sufficiently discredited that evidence such that it may be reasonably construed to create a question of fact.

To start, the fact that the Arbitration Agreement itself does not bear Plaintiff's handwritten signature is immaterial. Indeed, there is no legal requirement that an arbitration agreement be signed at all. *See Caley*, 428 F.3d at 1368 ("[W]hile the FAA requires that the arbitration agreement be in writing, it does not require that it be signed by the parties."). In any event, Defendants have introduced evidence that Plaintiff electronically accepted the Offer Letter, which bears his digital signature and is expressly conditioned on his acceptance of the Arbitration Agreement. This evidence remains uncontroverted, and nothing further is required for enforcement. *See* O.C.G.A. § 10-12-7(a) ("A record or signature shall not be denied legal effect

or enforceability solely because it is in electronic form."); *U.S. Fidelity and Guar. Co. v. West Point Const. Co., Inc.*, 837 F.2d 1507, 1508 (11th Cir. 1988) (enforcing arbitration agreement incorporated into another document signed by the parties); *LaSonde v. CitiFinancial Mortg. Co., Inc.*, 614 S.E.2d 224, 225–26 (Ga. Ct. App. 2005) (same). As for the other defects alleged, Plaintiff's challenge misses the mark. Evidence always leaves room for more authentication, more corroborating markers (e.g., through audio or video recordings, digital traces, additional witness testimony, etc.). But absolute authenticity is not the standard. Perfection need not be the enemy of the good—or, as germane to this setting, the *competent*.[10]

To authenticate evidence, the Federal Rules of Evidence require only that "the proponent must produce evidence sufficient to support a finding that the item is what

---

[10] In challenging the authenticity of Defendants' evidence, Plaintiff cites to a recent unpublished decision from this Court in *Reed v. Eastside Med. Ctr., LLC*, Civ. No. 1:19-cv-03967-SDG. In *Reed*, certain healthcare defendants sought to enforce an arbitration agreement allegedly electronically signed by the deceased plaintiff's wife (with a power of attorney) upon his admission to the hospital shortly before his death. The Court in *Reed* initially concluded that a genuine issue of fact remained with respect to the arbitration agreement's formation and the authenticity of the wife's signature because the wife did not recall signing the agreement and it was the only document among a suite of intake documents that was allegedly signed electronically. Moreover, the *Reed* defendants initially introduced no evidence to sure up the arbitration agreement's authenticity—i.e., no testimony regarding routine hospital intake procedures, or evidence indicating that the electronic arbitration agreement was secure and only accessible by the plaintiff or his wife. (ECF 41). After the defendants submitted affidavit evidence confirming such routine procedures as well as the wife's electronic acceptance of the arbitration agreement in connection with those procedures, however, the Court granted the defendant's motion and ordered the claims to arbitration. (ECF 57). In doing so, the Court noted: "[L]ack of memory is not enough to create a genuine issue of material fact under Georgia law. In the face of 'positive and uncontradicted evidence' that the parties entered into a contract, equivocal testimony to the contrary cannot defeat summary judgment." (*Id.* at 13–14). Such is the case here, too.

the proponent claims it is." Fed. R. Evid. 901(a); *accord United States v. Williams*, 865 F.3d 1328, 1343 (11th Cir. 2017) (noting that Rule 901 "require[s] only enough evidence that a jury could have reasonably concluded that a document was authentic"). Here, Defendants have introduced the Arbitration Agreement along with the sworn declaration of a record custodian attesting to both HPE's regular hiring process and its recording of Plaintiff's electronic acceptance of the Arbitration Agreement as he worked through that process. It is therefore incumbent upon Plaintiff, if he wishes to exclude or discredit such evidence, to show that it should not be trusted. He has not done so. As explained, Plaintiff has not offered any actual evidence to cast doubt on the authenticity of the Arbitration Agreement or the validity of his acceptance of same, and his attempt to do so hinges solely on his failure to recall and alleged evidentiary omissions that are not required. The undersigned finds that the Arbitration Agreement bears sufficient markers of authenticity to be considered, markers which Plaintiff has not succeeded in rebutting to create a corresponding question of fact. *See* Fed. R. Evid. 901(a); *Melver*, 2013 WL 12148376, at *2 (detailing authentication of employer's electronic onboarding process that included acceptance of an arbitration agreement); *Garcia*, 2021 WL 1610093, at *4 (same); *accord* Fed. R. Evid. 803(6) (business records exception); *In re Int'l Mgmt. Assocs., LLC*, 781 F.3d 1262, 1268 (11th Cir. 2015) (noting that in order to admit business records under Rule 803, the "testifying witness does not need

firsthand knowledge of the contents of the records, of their authors, or even of their preparation").

Ultimately, the key question as refined by Georgia state law is whether the parties' conduct and surrounding circumstances establish Plaintiff's assent to the Arbitration Agreement. *See Aaron*, 826 S.E.2d at 444; *Extremity Healthcare, Inc.*, 793 S.E.2d at 536; *Benedict v. State Farm Bank, FSB*, 709 S.E.2d 314, 319–20 (Ga. Ct. App. 2011) (concluding that the parties' conduct and surrounding circumstances were sufficient to show the existence of an enforceable arbitration agreement). Even when Plaintiff's sworn statements are fully credited and all justifiable inferences drawn in his favor, the evidence here, consisting of uncontroverted sworn testimony regarding Defendants' hiring practice and Plaintiff's electronically recorded acceptance, answers that question affirmatively.

On the issue, there is a further point worth noting. In Georgia, "an employee can accept new terms of employment which the employee is aware by remaining in employment." *Caley*, 428 F.3d at 1374 (citing *Fletcher v. Amax, Inc.*, 288 S.E.2d 49, 51 (Ga. Ct. App. 1981)). In other words, an employee can manifest assent to the terms of employment through the act of employment itself. *Id.* And here, it is undisputed that, at a minimum, Plaintiff received and accepted the Offer Letter prior to the commencement of his full-time employment, and that the terms of the Offer Letter made express reference to and were conditioned upon acceptance of the

23

Arbitration Agreement. It is well established that a party to a contract "who can read must read, or show a legal excuse for not doing so." *Megel*, 654 S.E.2d at 660 (citation omitted); *see also Brewer v. Royal Ins. Co. of Am.*, 641 S.E.2d 291, 293 (Ga. Ct. App. 2007) ("[O]ne who signs a contract is presumed to know its contents . . . .") (citation omitted). That means that, unless Plaintiff could not access the Arbitration Agreement to which he was unquestionably alerted when he accepted the Offer Letter—and he has introduced no evidence to that effect—then his actual employment thereafter could itself resolve the issue against him. *See Caley*, 428 F.3d at 1374.

In sum, Plaintiff's failure to recall the Arbitration Agreement has little to no probative value on the issue in dispute, while his challenge to the authenticity of the Arbitration Agreement is unpersuasive. For factual disputes to be considered genuine, they must have a "real basis in the record." *Mize*, 93 F.3d at 742 (citation omitted). Here, however, any dispute concerning the formation of the Arbitration Agreement does not. The record is one-sided and conclusive. Accordingly, the undersigned **RECOMMENDS** that the Arbitration Agreement be enforced and that this action be submitted to arbitration.

### B. Severance of the Confidentiality Provision

In his response to Defendants' motion to compel arbitration, Plaintiff requests that, if the parties are ordered to arbitrate, the confidentiality provision of the

Arbitration Agreement should nevertheless be severed as contrary to the spirit and policies of the ADEA. (Doc. 30 at 8–9). Plaintiff cites to a decision from this Court, *Gamble v. Air Serv Corp.*, 247 F. Supp. 3d 1302 (N.D. Ga. 2017), in support.

The undersigned is not persuaded that the confidentiality provision should be stricken from the Arbitration Agreement. In *Gamble*, this Court held that a confidentiality provision included in the parties' proposed employer-employee settlement agreement contravened both the FLSA's purpose in disseminating information about employment rights and the public's interest in preventing workplace exploitation. 247 F. Supp. 3d at 1306–07. In particular, the Court explained that the FLSA was designed to "to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce." *Id.* at 1304 (citation omitted). And to that end, as a way of protecting the "private-public rights" it created, the Court noted that the FLSA requires employers to display a detailed notice of FLSA rights in the workplace. *Id.* at 1305. However, the Court concluded that the informational objective of that notice would be thwarted by the enforcement of a confidentiality provision "silencing the employee who has vindicated a disputed FLSA right." *Id.* (quotation and citation omitted). Accordingly, the Court struck the confidentiality provision from the final approved settlement agreement. *Id.* The undersigned finds *Gamble* distinguishable from the present case.

There are three decisive distinctions here. First, the statutory regimes are different—*Gamble* was decided under the FLSA, while this case concerns claims arising under the ADEA. Both statutes, broadly speaking, address workplace protections. And, to be sure, the ADEA incorporates the FLSA's collective action provision. *See* 29 U.S.C. § 626(b) (ADEA enforcement provision incorporating FLSA's collective action provision, 29 U.S.C. § 216(b)). However, the two statutes address different wrongs, and the information-related FLSA purposes that controlled in *Gamble* are not obviously present here. Second, the procedural posture is different—*Gamble* concerned the judicial approval of an out-of-court settlement under federal law, whereas this case concerns the enforceability of an arbitration agreement under Georgia law. Finally, the Court need not presently reckon the significance of the just-described differences because the Eleventh Circuit has already weighed in. In *Caley*, the Eleventh Circuit held that, under Georgia law, a confidentiality provision in an arbitration agreement governing ADEA claims was "not so offensive as to be invalid." 428 F.3d at 1379; *see also Am. Family Life Assurance Co. of Columbus v. Hubbard*, 759 F. App'x 899, 906 (11th Cir. 2019) (reiterating the enforceability of a confidentiality provision in an arbitration agreement under Georgia law).

For these reasons, the undersigned further **RECOMMENDS** that the Arbitration Agreement be enforced in full, without severance of the confidentiality provision.

## IV.   CONCLUSION

Based upon the foregoing, the undersigned **RECOMMENDS** that Defendants' motion to compel (Doc. 29) be **GRANTED**, and that their alternative motion to dismiss be **DENIED AS MOOT**. The undersigned further **RECOMMENDS** that, if the District Judge adopts the preceding recommendation and orders this case to arbitration, this case be **STAYED** and **ADMINISTRATIVELY CLOSED** pending the completion of such arbitration, with instruction to the parties to provide the Court with periodic status reports.[11]

IT IS SO **RECOMMENDED** on this 20th day of May 2021.

_____
REGINA D. CANNON
United States Magistrate Judge

---

[11] The Eleventh Circuit has expressed its preference that district courts stay arbitrable claims rather than dismiss them. *See Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 699 (11th Cir. 1992).